Filed 8/4/14  Certified for publication 9/2/14 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JOHN S. KAO,<br><br>　　　Plaintiff and Appellant,<br><br>v.<br><br>THE UNIVERSITY OF SAN FRANCISCO et al.,<br><br>　　　Defendants and Respondents. | A135750<br><br>(City and County of San Francisco Super. Ct. No. CGC-09-489576) |

　　　Plaintiff John S. Kao sued the University of San Francisco (USF) for violations of the Fair Employment and Housing Act (Gov. Code, § 12900 et seq. (FEHA)), the Unruh Civil Rights Act (Civ. Code, § 51 et seq.), and the Confidentiality of Medical Information Act (Civ. Code, § 56 et seq.) in connection with the events surrounding his termination as a professor at USF.  He also asserted causes of action against USF for violation of his right to privacy (Cal. Const., art. 1, § 1), and against USF and its Assistant Vice President for Human Resources, Martha Peugh-Wade, for defamation.

　　　USF directed Kao to have a fitness-for-duty examination after faculty members and school administrators reported that his behavior was frightening them, and the university terminated his employment when he refused to participate in the examination. The court granted a nonsuit against Kao on the defamation cause of action, and a jury ruled against him on his other claims.  Kao contests the judgment on multiple grounds, but his principal contention is that USF could not lawfully require the examination.  We disagree and affirm the judgment for USF.

1

# I. BACKGROUND

A. <u>Kao's Threatening Behavior</u>

Dr. Kao earned a Ph.D. in applied mathematics from Princeton, began teaching mathematics at USF in 1991, and became a tenured professor in 1997. Kao was concerned about a lack of diversity of the faculty of the math and computer science departments, and submitted a 485-page complaint to the school in May 2006 alleging race-based discrimination and harassment. He lodged a 41-page addendum to the complaint in August 2007, to which Assistant Vice-President Peugh-Wade responded in September 2007. Kao was not satisfied with Peugh-Wade's two-page response, which he said did not offer any remedies for the problems he perceived with the way the school recruited new faculty. The application period for hiring during the 2007-2008 academic year closed in December 2007, and fewer applications had been received than in prior years. On January 3, 2008, Kao met with mathematics professor Paul Zeitz and then Associate Dean for Sciences Brandon Brown about the school's failure to advertise in professional journals.

At trial, Zeitz described his January 3 meeting with Kao as "the most upsetting thing that's ever happened to me at my job." Kao was "speaking very politely" about the job search "and then suddenly . . . was unable to control his emotions." He was "very, very upset that . . . our employment ads did not include what he felt were the appropriate ads in print," and started "yelling and screaming." Zeitz said, "[I]t was very personal. It was as though I had personally done something horrible to him."

Zeitz was "terrified" by Kao's behavior. He said that Kao was "an expert in martial arts. . . . I remember years ago he told me he was the ivy league judo champion. And some years prior to this incident, he told me that he had bought . . . a used wooden mannequin for punching practice. And so he is somebody who punches a wooden mannequin and is an expert in judo, and he is not in control of his emotions and he's three feet away from me. I mean, I was extremely, extremely scared." Zeitz was hired by USF the year after Kao and had never before been afraid of him, "[b]ut in 2008, it was this sudden change to complete irrational, uncontrollable rage . . . ."

2

Kao testified that Zeitz told him Dean Brown had made the decision to advertise only in online databases, and Brown testified that Kao confronted him at his office on January 3. Brown said that Kao's fists were clenched and he seemed very tense and angry. He "immediately began shouting about the mathematics job search. He was just incredibly agitated, enraged, really, about the placement of these job ads." Brown testified, "I was frightened. I'd never been in a situation like that in the working world. Or anywhere else, really. . . . [I]f you want to give someone nonverbal clues that you are about to attack them, from my reading that's what was going on."

Zeitz, and mathematics professors Tristan Needham, Steven Yeung, and Stephen Devlin testified to disturbing behavior by Kao at a February 2008 faculty search committee meeting. Zeitz described Kao as having an "uncontrolled rant about things that made no sense . . . coupled with . . . changes in body language, changes in posture and changes in demeanor. It was very upsetting and very scary for me." Yeung said that Kao was "yelling" and "standing up and leaning towards people" at the meeting, and he was "afraid that it would be not just verbal but get physical." Needham said that Kao threw papers across the table, and "it was pretty intimidating." Devlin said that Kao was "shaking with anger" and "screaming" at the meeting.

Kao's concerning behavior continued throughout the spring semester. Needham, Yeung, and Zeitz testified that Kao became physically confrontational with them. Needham said that Kao "hit [him] quite forcefully on the shoulder" as they walked in opposite directions in a school corridor. Needham said he "knew how angry [Kao] was. It was clear. But to me, there was a big difference in crossing the line between the mental world and the physical world. I thought to myself if he can bump me, what's to stop him from shooting me." Zeitz said that Kao bumped into him twice and "this had never ever happened before." Yeung described an incident when Kao was walking on the opposite side of a school corridor "and all of a sudden he took a sharp turn, and . . . was charging toward me and then [turned] right before [a] collision actually took place . . . ." Yeung said, "As far as I could tell, he deliberately took this turn to approach me and then moved away. [¶] . . . I did not actually get hit, but it's just bizarre. And again, next time maybe

3

I wouldn't be that lucky. . . . I just couldn't understand what was going on. I was very frightened."

Jennifer Turpin, who was the Dean of USF's College of Arts and Sciences, testified to an incident on April 22 when she encountered Kao while walking to her car. She knew that Kao's mother was ill and asked him how his mother was doing. Turpin was shocked when Kao became "enraged" by the question. "He kind of clenched his jaw and he looked mean and mad and he got right in my face and said, 'Fine. Fine. How are you and how are your children doing?' " Turpin wondered whether Kao knew that her daughter had been hospitalized, but worried that the question was a threat, and "figured I better make a beeline to my car." As she was starting her car, she saw him "standing there with clenched fists glaring at me, like leaned over looking at me angrily. . . . I was kind of in disbelief, like, oh, my God, did that just happen? You know, I was really scared." Turpin reported the incident to Peugh-Wade and others that day.

Needham testified to a similar incident at a math department party toward the end of the semester. Needham's wife asked Kao how his mother was doing, and his "reaction was instantaneous rage. . . . [H]e got in her face and very close to her and again rigid with anger and raised his voice and said, 'How's your mother? How's your mother? How's your mother?' " in a "startling frightening way." He "seemed out of control," and "left right after that." Needham testified that "you could actually see [Kao] rigid with anger" on other occasions, "like white knuckles then the foaming at the mouth." Another "new thing that semester is [Kao] started this wild cackling laugh . . . ."

Needham, Yeung, and Zeitz testified that they feared Kao and worried about having contact with him. Needham was "afraid of [Kao] and afraid of provoking further anger by attempting to talk to him." Needham felt "extremely uneasy being on campus" that semester, and said that "even with office hours and so on, I tended to keep my door shut unless I had to have it open." Yeung said he tried "not to be too close, especially . . . one-on-one . . . with Dr. Kao, because . . . I feared for my safety." "When I say I worry about my safety . . . I mean . . . whether I will be alive or dead, that kind of physical safety." Zeitz said that coming to work "was very unpleasant, it was scary. . . . [W]hen I

4

walked towards my office, I would think about exit routes. I would . . . make sure I had a phone with me. I tried to be aware of the location of Dr. Kao. I would try to avoid him . . . I would do everything I could not to have any interactions with him of any kind." He said his fear of Kao was "the dominating thing of that spring for me."

Zeitz said his colleagues shared his concerns: "[W]e're not talking about happy people this spring. Everyone is looking kind of pale and shaken and . . . the dominant emotion is fear and confusion, because . . . it's not expected. It's not something that any of us had ever dealt with before. We don't know what's happening. We don't know what's going to happen. That's how my colleagues were."

B. USF's Investigation

USF began investigating the situation in January. Peugh-Wade met with Brown on January 8 to discuss Kao's interaction with Brown and Zeitz on January 3. Brown recorded in an email to himself on January 9 that Zeitz told him about his encounter with Kao and had "lost a good bit of sleep since this incident." Kao was "threaten[ing] the work environment of his departmental colleagues. . . . [¶] Including conversations of the last week, I have had three professors (requesting anonymity) tell me they fear that John may be capable of some sort of great violence. 'I would not be surprised if he (harmed himself or others) at some point,' is the typical quotation." Brown noted that he was "not qualified to determine if [Kao] is a threat to himself or others, but his behavior cannot be described as logical, predictable or within basic professional norms."

On January 22, Dean Turpin contacted Paul Good, a clinical and forensic psychologist. Good testified that USF "was looking for some input on an educational level about markers for violence or things to look for that might suggest an escalation of hostilities . . . and how best for the institution to respond." Good had a meeting with Turpin and Peugh-Wade on February 12 "about predicting violence, explaining risk factors such as pyschopathy and narcissism and other risk prediction schemes that might be related to their issues with Dr. Kao . . . ." Good referred the deans to a threat assessment manual for schools prepared by the FBI.

5

Peugh-Wade met with Needham on April 28, and Zeitz on May 1, and learned much of the same information about Kao that was described in their trial testimony. Peugh-Wade also met on May 1 with Professor Peter Pacheco, the chairperson of the math department. Pacheco told her that he had no personal experiences with Kao like those of Needham and Zeitz, but when asked what Kao was like "one-on-one," Pacheco answered, "His temperament is such I avoid any interaction with him." Peugh-Wade also interviewed Deans Brown and Turpin. She was trying to determine whether "there was consistent concern from a number of people such that I needed to look into it further or someone, an expert needed to look into it further."

On May 20, Peugh-Wade and several colleagues met with forensic psychiatrist James Missett, an expert on threat assessment and fitness-for-duty evaluations (hereafter FFDs). Peugh-Wade had provided Missett with summaries of her faculty interviews, and Brown told Missett about his concerns. Missett told the group that the only way to assess whether Kao could "do his job . . . in a safe way was to have an independent medical exam by an independent physician." Missett testified that USF was required to provide a campus where people could safely work, and had "an affirmative obligation to take action with respect to Professor Kao." He believed that the action "that appeared to offer both [USF] and Professor Kao the most in a way of . . . a possible good outcome would be [an FFD]." He explained that an FFD is confidential, and no psychiatric diagnosis can be disclosed to the employer. The evaluator can only tell the employer whether the employee is fit to perform the job, not fit, or fit with accommodation. He recommended three doctors who would be qualified to perform an FFD of Kao. Peugh-Wade contacted the three doctors, and selected Dr. Norman Reynolds, whom Missett had recommended the most highly.

Peugh-Wade directed Reynolds not to provide any "medical diagnosis or other clinical information." She sent Reynolds a consent form for Kao to complete, which stated: "I DO NOT authorize Dr. Reynolds to release records to anyone. [¶] Nevertheless, Dr. Reynolds . . . is permitted to release to my employer a statement that I am fit-for-duty or that I am not fit-for-duty and specify functional limitations. Dr.

6

Reynolds is not permitted to release information regarding causation or any other matters." The form stated the "Comprehensive Psychiatric [Fitness-for duty] Evaluation will consist of: Review and analysis of complete history and background, e.g., current difficulties, medical history, legal and financial history, educational and work history, family and social history [¶] Mental Status Examination [¶] Psychological test results [¶] Laboratory results [¶] Diagnostic assessment [¶] Analysis of findings, conclusions and recommendations."

C. USF's Interaction With Kao and Termination of his Employment

Peugh-Wade met with Kao and his attorney on June 18. Peugh-Wade gave Kao a letter of that date, labeled "Draft – Discussion Item," which contained this description of his behavior: "[T]here have been multiple reports from a variety of well-intentioned individuals who are, quite frankly, frightened by your conduct. There are reports of you[] yelling, exhibiting highly contorted facial expressions that suggest unfeigned anger (staring/glaring, e.g.), impeding or attempting to impede others' physical movements (e.g. sudden movements in the hallways that cause people to believe you will suddenly run into them or impede their pathway), similarly, bumping and/or nearly bumping into people in a manner that suggests intent to do so, rapidly repeating the same words during meetings and conversations, displaying an expression or gesture that indicates you cannot or do not want to listen to what others have to say, and bizarre chuckling in a[n] intimidating tone that conveys the message you are doing so to frighten whomever may hear it."

The letter stated that his behavior raised "concern about [Kao's] health," and that Peugh-Wade was considering "a recommendation to University authorities that will result in one or more of the following: [¶] 1. Placing you on a leave of absence, without duties or physical presence at the University; [¶] 2. Requiring a health 'fitness for duty' evaluation of you by an independent physician ('IP') selected by the University, at the University's expense, with the IP issuing a report to the University regarding your fitness for your faculty functions here at the University. You will be required to cooperate with this process, provide your medical records for the past years to the IP, and meet with the

IP cooperatively. The IP, however, would not disclose your medical records, or medical diagnoses of your health professionals, to the University. [¶] 3. Other actions yet to be considered." The letter concluded: "Once again, before making a final decision, the University, through me, would welcome explanations, information or anything else you and/or your attorney wish to provide that may assist us in fulfilling our duties as an institution of higher learning. We want to proceed thoughtfully and with respect for you, as well as for all others on the campus."

On June 20, Peugh-Wade sent an email to Kao and his attorney saying: "I want to reiterate that if you have any information you believe the University should consider in making its decision on this matter, please either provide the information to me, or let me know the nature of the information by Monday, June 23. . . . [¶] With regard to your request for detailed information about the reports that form the basis for concern, I do not believe providing that information would be productive." Kao's attorney responded that day, objected to the June 23 deadline, and said: "You are asking Professor Kao to agree to a detailed medical/psychological examination and to produce all his medical records for that purpose. It is not unreasonable (or unproductive) to ask the University to give more detail as to the events apparently underlying that request so that Professor Kao can evaluate the University's demand in light of the evidence asserted to justify it."

In a letter dated June 24, Peugh-Wade put Kao on a "leave of absence without duties," prohibiting him from being on campus while on leave, and directing him to participate in an FFD by Reynolds on July 1. The letter listed the behaviors of concern, which were the same as those set forth in her June 18 letter except that the "highly contorted facial expressions" were said to have been "with fists clenched," and an allegation of "inappropriate closeness" was added to those about bumping into people.

Kao's counsel responded at length in a letter dated June 26, and advised that Kao would not attend the FFD. The letter reiterated that USF had not given "any dates or time frames for the events, locations, [or] persons involved . . . ." The letter stated: "[T]he University had never advised Professor Kao of any of these allegations or incidents before our meeting on June 18. Treating Professor Kao as a danger to others is, frankly,

8

bizarre under these circumstances. Surely, if Professor Kao was the danger the University claims, the University would have acted promptly on at least one of these incidents. To allow Professor Kao to continue working through the end of the year, without taking any action or even advising him of these concerns indicates to us that the University's purported concerns about safety are exaggerated, unreal and pretextual. [¶] . . . [¶] At our June 18 meeting, we proposed some form of letter or meeting to clear the air over these concerns and to assure everyone that . . . Professor Kao intends no harm to anyone." However, the University had "apparently rejected this straightforward solution to the apparent problem of people's misperceptions as to Professor Kao . . . ." The letter argued that USF's demand for an FFD was unlawful, and "appear[ed] to be in retaliation for Professor Kao's internal grievances that have alleged, among other things, discrimination and violation of University policies."

In a letter to Kao dated June 30, Peugh-Wade acknowledged receipt of his counsel's June 26 letter, and repeated her demand for an FFD. Dean Turpin sent Kao a July 8 letter directing him to contact Reynolds immediately for an FFD, and warned him of disciplinary action if he failed to comply.

David J. Philpott, USF's Director of Employee and Labor Relations, set up a meeting with Kao and Kao's counsel on October 27 to start the process of progressive discipline required under USF's collective bargaining agreement with Kao's faculty union, and to try to persuade Kao to submit to the FFD. The meeting was attended by Philpott, Kao, Kao's attorneys, and Elliot Neaman, Kao's union representative.

Philpott was friendly with Kao and was "personally hoping to . . . interact with John in some informal setting. [¶] In the world of labor relations, a lot of times things can be accomplished if it's a different messenger or different voice or someone that you might know." Philpott was "hoping that John would either agree to participate in the fitness for duty or possibly come up with some other scenarios, other than 'I'm not participating,' that I could take back to my colleagues and try to use that as leverage to change our mind or change our position." However, "the conversation was mostly with [Kao's counsel], who was inquiring on what legal right we had to request a fitness for

9

duty, and I deferred these type of questions to my boss and the outside legal counsel that we were relying on for their expertise and guidance."

Philpott testified that when Kao's counsel asked for the dates and individuals involved in the allegations, he told them USF was not comfortable providing that information. Philpott said he observed at the meeting "behaviors [by Kao] that I had read about from some of John's colleagues, and it was the first time that I had witnessed it in my interactions with John over the 10 to 12 years that I had known him. He was leaning back in his chair . . . he had clenched fists. I could see the whites of his knuckles." Philpott said Kao was "occasionally nodding his head, rapidly blinking his eyes, and had a grin on his face that . . . I had not seen. And based on what I had read and had heard from others, that I could see how someone could feel uncomfortable if they had witnessed that."

Kao provided Philpott various documents at the meeting, including invitations to social events he had received from members of the math department in May, June, and September, and a record of the above-average student evaluations he had received in the spring semester.

Philpott wrote Kao a letter dated December 29, stating that USF had considered the information he presented at the meeting, that he was being suspended without pay, and that his employment would be terminated if he did not submit to an FFD by January 15, 2009. The letter noted that Kao's attorneys disputed whether USF could lawfully require the FFD, and USF offered to arbitrate the dispute under the collective bargaining agreement. Alternatively, USF offered to submit the dispute for "a final and binding decision by a mutually selected retired jurist. The University would be prepared to pay your share of the professional fees of the retired jurist. If the jurist decided in your favor, the University would rescind the suspension and award you appropriate remedial relief."

Philpott explained at trial that USF wanted to provide "at least two options, to try to remedy the situation or at least find some common ground and get past the lock-in we had on this issue of fitness for duty." He said, "[T]he general feeling was we didn't want to move to terminate. We were trying to find a different way, a creative way. We were

10

exploring all options. And our hope was by proposing two, it would open up the door for a conversation that either they could propose some other options or they would take us up on the two that we had put forward, which we thought were reasonable . . . ."

In a January 12 letter, his counsel replied that Kao "has no desire to surrender any of his legal rights, including his right to institute legal actions against USF for discrimination and violation of federal and California law in appropriate courts, with the right to full discovery, a jury trial, damages, attorney fees and the availability of an appeal to correct errors of law. As you are aware, agreeing to arbitration would [e]ffect a complete surrender of these rights and give a 'retired jurist' the power to determine all the issues without full discovery, oversight or review. . . . [¶] . . . At this point, given USF's repeated unwillingness to describe the events that it asserts justify a mental examination, it appears to us that only the full discovery procedures available in court will enable Professor Kao to determine the factual basis or, more accurately, lack of factual basis for USF's demands."

Philpott replied in a letter dated January 16: "I checked with University attorneys after I received your last letter, and I can now confirm that the jurist procedure does not need to be 'final and binding' on you, although my last letter stated otherwise. You will not be required to sign any waiver of lawsuit rights and you may have discovery of whatever the retired jurist approves. [¶] We would agree that the jurist procedure will be advisory to you, and binding only on the University. That is, the University would abide by the jurist's opinion if it were against the University, but if it were against you, you would not have to abide by it—you would retain your rights to sue or file a grievance under the collective bargaining agreement." Philpott testified that he kept Neaman, Kao's union President, apprised of these developments, and Neaman did not object to USF's proposals. Philpott requested a response from Kao by January 22, and set a January 31 deadline for completion of the FFD.

Kao rejected USF's offer in a letter from counsel dated January 22. The letter stated that the offer "would only add additional time and expense in asserting [Kao's] legal rights. The non-binding advisory arbitration procedure prevents Professor Kao

11

from receiving the full benefits and protections of a court action." The letter reiterated Kao's belief that a "clear the air" letter or meeting would be an appropriate way to address USF's concerns. Philpott testified, "Based on the information that I had and what had been shared with me, I don't believe many of John's colleagues would have attended that meeting."

Philpott wrote Kao on January 23: "Your attorney has once again suggested the University resolve this matter by accepting a letter from you, or allowing you to attend a meeting, in which you would assure the University you intend no harm to anyone. While it is undeniably true that the University seeks such assurance, and has sought such assurance since it first directed you to participate in the evaluation, in light of your behavior, you are not the one who can provide the level of assurance the University requires. The assurance the University requires must come from someone with the necessary expertise, *i.e.*, an independent physician."

Dean Turpin terminated Kao's employment in a February 3 letter for his failure "to carry out the work-related instructions of the University to cooperate with an independent medical evaluation."

D. Other Trial Evidence

(1) *Kao's Case*

Kao testified that he never intentionally tried to frighten, threaten, or bump into anyone while he worked at USF. He said that he talked in a normal tone of voice but a little louder than normal when he met with Zeitz on January 3 because he wanted Christine Liu, a math department program assistant who was sitting nearby, to hear what was being said. When he spoke to Brown that day he did not raise his voice and they had a "friendly" discussion. He said that the February 2008 faculty meeting had the tone of a "debate," and that he spoke "[i]n an ordinary fashion for a discussion in which there's some disagreement. . . . [M]y voice maybe got a little louder sometimes, but other people's voices also got louder sometimes." He denied throwing papers at the meeting. The only person he recalled bumping into at the school in the 2008 semester was a Dr. Cruse. He said that he laughed when he was nervous, feeling socially awkward, or did

12

not know what to say. This was a Japanese cultural trait he observed in his mother, and it could have been "misperceived."

Kao testified that he began taking Prozac for depression in January 2002, and that the drug caused him to suffer hallucinations. The hallucinations went away when he went off the medication, but he did not agree to the conditions Needham imposed for his return to work, and so he chose not to teach that semester. Psychiatrist Lenore Terr testified that she began treating Kao in 2003, and that she had prescribed various medications for his episodic major depressive disorder. Kao testified that tremors in his arms and legs were a side effect of medications he began taking in 2007. Apart from a 15-month period in 2004 and 2005, Terr had seen Kao once a week since October 2003. She had seen "absolutely nothing" in her treatment that indicated Kao was a danger to anyone at USF.

(2) *USF's Case*

James Cawood, former President of the Association of Threat Assessment Professionals, opined that USF acted reasonably in requiring Kao to undergo an FFD. In Cawood's view, an FFD was warranted by the increased frequency and intensity of the feelings Kao expressed, and the "degree of disturbance" reported by the people who feared him. Cawood had "learned not to discount people's instincts." He acknowledged that USF took a risk by waiting several months before confronting Kao about the problems he was causing, but "it worked for them" because no serious harm was done. He said that institutions typically overreact to any threats of violence and do unnecessary harm to reputations "so that no one can second guess them in the future and say that they did something wrong." He thought that when USF informed Kao of its concerns, it reasonably withheld names and dates to protect the people involved from possible retaliation. He believed that Kao's proposed "clear the air meeting" was inadvisable and would just have "made people even more anxious . . . ."

13

## II. DISCUSSION

A. <u>Requiring the FFD</u>

    (1) *Interactive Process*

    Kao's central contention in this appeal is that USF had to engage in an interactive process before it could refer him for an FFD. But in the circumstances presented here, no such interactive process was required.

    FEHA permits an employer to require a medical or psychological examination of an employee if it can show that the examination is "job related and consistent with business necessity." (Gov. Code, § 12940, subd. (f)(2).) Current Fair Employment and Housing Commission (FEHC) regulations similarly provide that an employer "may make disability-related inquiries, including fitness for duty exams, and require medical examinations of employees that are both job-related and consistent with business necessity." (Cal. Code Regs., tit. 2, § 11071, subd. (d)(1).)

    Kao contends that a "psychological examination by an employer-chosen doctor cannot be job related and consistent with business necessity unless the employer uses the interactive process." Sometimes, but not always. An employer must reasonably accommodate an employee's disability unless doing so would produce undue hardship to its operation, (Gov. Code, § 12940, subd. (m)), and an employer has an additional duty "to engage in a timely, good faith, interactive process with the employee . . . to determine effective reasonable accommodations . . . ." (Gov. Code, § 12940, subd. (n).) FEHA thus ties the interactive process to disability accommodations, not FFDs. (Compare Gov. Code, § 12940, subds. (f) & (n).) The requirement for an interactive process was not implicated here because Kao never acknowledged having a disability or sought any accommodation for one.

    Unless a disability is obvious, it is the employee's burden to initiate the interactive process. (*Gelfo v. Lockheed Martin Corp* (2006) 140 Cal.App.4th 34, 62, fn. 22; 2 Wilcox, Cal. Employment Law (2013) § 41.51[3][b], p. 41-278.) Kao cannot plausibly claim it should have been obvious to USF that he was disabled because he never admitted any disability in the workplace. When a disability is not obvious, the employee must

14

submit "reasonable medical documentation confirm[ing] [its] existence." (Cal. Code Regs., tit. 2, § 11069, subd. (d)(2).) Kao did nothing of the sort. He provided no information to USF after learning of the university's concerns other than documents at the October 2008 meeting with Philpott, which were aimed at showing that those concerns were illusory.

Consistent with the evidence in the case, the jury was not instructed to consider, in deciding whether an FFD could lawfully be required, whether USF had engaged in an interactive process.[1] No interactive process was necessary, and there is no substance to Kao's argument that USF improperly failed to participate in that process.[2]

(2) *Substantial Evidence*

Kao also contends that USF did not present substantial evidence that the FFD was "job related and consistent with business necessity" as required by Government Code section 12940, subdivision (f). "In evaluating this claim, we apply the familiar substantial evidence standard of review: We view all of the evidence in the light most favorable to the judgment, drawing every reasonable inference and resolving every

---

[1]The jury was instructed in accordance with Government Code section 12940, subdivision (f): " 'John Kao claims that the university wrongfully required a medical and psychological examination (fitness-for-duty or FFD). [¶] . . . The University of San Francisco asserts that the medical or psychological examination (fitness-for-duty or FFD) request was lawful because it was necessary to the university's business. To succeed, the university must prove both of the following: 1, that the purpose of the FFD was to operate its business safely and efficiently; and 2, that the FFD would substantially accomplish this business purpose. [¶] . . . If the university proves that the FFD is necessary to the university's business, then the FFD is lawful unless John Kao proves both of the following: 1, that there was an alternative to the FFD that would have accomplished the university's business purpose equally well; and 2, that the alternative would have had less adverse impact on John Kao.' " Nor was the jury required to make any finding as to an interactive process. The general verdict form simply asked: "Is there liability of University of San Francisco to [J]ohn [K]ao on the claim related to the medical and psychological examination?" and the jury answered, "No."

[2]Kao's request for judicial notice of administrative materials in connection with this argument is denied.

15

conflict to support the judgment." (*Jonkey v. Carignan Construction Co.* (2006) 139 Cal.App.4th 20, 24.)

An FFD is "job-related" if it is "tailored to assess the employee's ability to carry out the essential functions of the job or to determine whether the employee poses a danger to the employee or others due to disability." (Cal. Code Regs., tit. 2, § 11065, subd. (k).) Kao's jury had ample evidence from which to find that an FFD was necessary to determine whether he posed a danger to others in the workplace. Multiple people reported multiple instances of threatening behavior on his part. USF's decision to require him to have an FFD was based on expert advice, and USF presented unrefuted expert testimony that an FFD was appropriate under the circumstances. Kao asserts that USF had no "objective" evidence he was dangerous. He notes he did not explicitly threaten anyone, and believes he did not "hit or assault anyone in a way that indicated any significant or imminent risk of violence." These at best are jury arguments, and the jury could reasonably reject Kao's benign view of the situation.

There is a "business necessity" for an FFD if "the need for the disability inquiry or medical examination is vital to the business." (Cal. Code Regs., tit. 2, § 11065, subd. (b).) USF unquestionably has a duty, as its consultant Missett testified, to maintain a campus where people can safely work. The jury heard testimony that Kao frightened school administrators and that his behavior cast a pall of "fear and confusion" over the math department. The jury could reasonably find that it was vital to the university's business to obtain an independent assessment of his fitness for duty.

B. Unruh Act

Kao argues that, by banning him from campus, USF violated the Unruh Civil Right's act prohibition against disability discrimination (Civ. Code, § 51, subd. (b)). This contention hinges on Kao's claims that "the ban arose from a perception that [he] suffered from some mental disability that made him unusually dangerous and unpredictable," and that there was "no evidence of any actual danger—just USF's subjective perceptions." These claims are untenable.

16

As we have previously explained, there was substantial evidence for a legitimate concern that Kao was dangerous absent an independent evaluation to the contrary. Moreover, the thrust of the evidence was that USF did not know what was causing Kao's behavior, not that it had determined his behavior resulted from a disability. For example, when Philpott was asked whether he perceived Kao to be mentally unstable, he answered, "I can't draw a conclusion if he was mentally unstable. We weren't quite sure what was going on and that's why we wanted the evaluation. [¶] Q. In other words, mental instability was a factor in continuing the ban from campus? [¶] A. It could be put into the bucket of concerns that we had. It was one of—it was a concern, but I don't want to say it was mental illness. I'm not trained in that arena." Similarly, when Brown began reporting his concerns about Kao, he observed that he was "not qualified to determine if [Kao] is a threat to himself or others."

The evidence did not as a matter of law establish that USF had a discriminatory motive in keeping Kao away from campus.

C. Confidentiality of Medical Information Act

Kao argues that USF violated the Confidentiality of Medical Information Act (CMIA) by firing him for "exercise of rights under the CMIA to refuse to release medical information" to Reynolds for the FFD.

Civil Code section 56.20, subdivision (b) provides that "[n]o employee shall be discriminated against in terms or conditions of employment due to that employee's refusal to sign an authorization under this part. However, nothing in this section shall prohibit an employer from taking such action as is necessary in the absence of medical information due to an employee's refusal to sign an authorization under this part." "An employer 'discriminates' against an employee in violation of section 56.20, subdivision (b) if it improperly retaliates against or penalizes an employee for refusing to authorize the employee's health care provider to disclose confidential medical information to the employer or others . . . ." (*Loder v. City of Glendale* (1997) 14 Cal.4th 846, 861, italics omitted.)

17

Consistent with these authorities, the jury was instructed that if Kao proved his refusal to authorize release of confidential medical information for the FFD was "the motivating reason for [his] discharge," USF "nevertheless avoids liability by showing that . . . its decision to discharge Kao was necessary because John Kao refused to take the FFD examination."

The evidence described above that supported findings that the FFD was job related and consistent with business necessity also supported a finding that his discharge was "necessary" within the meaning of Civil Code section 56.20, subdivision (b) because of his refusal to release the medical information required for the FFD.

D. Defamation

Kao contends that the court erred by granting USF and Peugh-Wade's motion for a nonsuit on his cause of action for defamation. The defamation claim was predicated on the fact that Peugh-Wade sent Reynolds a copy of her June 24 letter directing Kao to participate in the FFD, which listed the frightening behavior people attributed to him. The nonsuit motion was based on the litigation privilege (Civ. Code, § 47, subd. (b)), the official duty privilege (Civ. Code, § 47, subd. (a)), and the common interest privilege (Civ. Code, § 47, subd. (c)).

The qualified common interest privilege protects "a communication, without malice, to a person interested therein . . . by one who is also interested." (Civ. Code, § 47, subd. (c).) USF, Peugh-Wade, and Reynolds had a common interest in the efficacy of Kao's FFD, and Reynolds needed to know the concerns that prompted it. Where, as here, the statements at issue are within the qualified privilege, the plaintiff has the burden to establish that they were made with malice. (5 Witkin, Summary of Cal. Law (10th ed. 2005) § 600, p. 883.) Given the defense verdicts on all of the other causes of action, there is no reasonable probability the jury would have found that the reports of Kao's behavior were malicious, or that USF or Peugh-Wade acted maliciously in advising Reynolds of them. (See generally *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574 [standard of prejudice for reversible state law civil trial error].) Thus, even if the court erred in granting a nonsuit on the defamation claim, the error was harmless.

18

E.  Mitigation of Damages

Kao argues that the court erred when it denied his motion in limine to exclude evidence that he could have mitigated his damages by obtaining employment outside a university.  He argues that any job other than a tenured college faculty position would not have been substantially similar to the one he lost at USF.  "[B]efore projected earnings from other employment opportunities not sought or accepted by the discharged employee can be applied in mitigation, the employer must show that the other employment was comparable, or substantially similar, to that of which the employee has been deprived . . . ."  (*Parker v. Twentieth Century-Fox Film Corp.* (1970) 3 Cal.3d 176, 182.)  The jury instructions stated that Kao's damages should not be reduced by money he could have earned from other employment unless USF proved "that employment substantially similar to [his] former job was available to him," and listed various factors to consider in deciding whether employment is substantially similar.  When the court denied the in limine motion about other available jobs, it noted that Kao could "cross examine regarding that evidence."

USF's labor economist questioned the assumption underlying Kao's damage claim that he would be out of work for the next 25 years, and identified jobs in government and industry that a computational mathematician like Kao, especially one with his Princeton Ph.D., could obtain.  The economist cited data indicating that more mathematicians are employed in the federal government and in scientific research positions than in universities, and that those mathematicians generally make more money.  Kao's argument for prejudice is that this testimony suggested he could be "rightly faulted as greedy, lazy or looking for a big payout from USF because he unreasonabl[y] failed to seek alternative employment in a non-teaching job."  USF argued to the jury:  "We ask that [Kao] not be awarded any money in this case, not only because there's no liability— the university didn't violate the law—but also because he made the choice to give up his secure job and then sit there for three years and spend his time suing and not once, not once, even try to look for a job.  Who does that these days?"

19

There was no error. The court could reasonably admit the evidence of other available jobs and leave the question of their substantial similarity to the jury. (*West v. Bechtel Corp.* (2002) 96 Cal.App.4th 966, 985 [whether the plaintiff has acted reasonably in mitigating damages is a question of fact]; *Mateel Environmental Justice Foundation v. Edmund A. Gray Co.* (2003) 115 Cal.App.4th 8, 25 [admission of expert testimony is reviewed for abuse of discretion].) Moreover, there was no prejudice. Since the jury never had to reach the issue of damages, it is not reasonably probable the verdicts would have been different if the evidence of other jobs had been excluded. (Evid. Code, § 354 [erroneous admission of evidence must cause a miscarriage of justice]; *Soule v. General Motors Corp., supra,* 8 Cal.4th at p. 574 [different outcome must be reasonably probable].)

F. <u>Spoliation of Evidence</u>

Kao argues that the court erroneously excluded evidence of a discovery request he made, which allegedly would have supported a jury instruction on spoliation of evidence by USF. His argument is not at all persuasive. The background is as follows.

The day after Dean Turpin's April 22 encounter with Kao on the way to her car, she made notes of the incident in an email to herself. The notes stated that, after she asked Kao about his mother, he said "*loudly,* 'fine, fine and how is your family, how are your children?' " (Italics added.) The notes further stated: "As I walked away, I felt John again very close to me, hovering over my *head. The whole incident* felt as if he was about to snap and about to hit me." (Italics added.) When Turpin sent the notes to Peugh-Wade in a June 26 email, she changed the words "said loudly" to "shouted," "head" to "back," and "[t]he whole incident" to "it." Turpin testified that she sometimes edits memoranda she writes to herself, and could not recall when she made the foregoing changes.

Turpin was then questioned about the computer on which the emails were written. She said that her office computer is regularly replaced by USF's IT department, and that the computer she was currently using was likely different from the one she used in 2008. Through Turpin, Kao introduced USF's May 27, 2011 response to Kao's discovery

20

request to inspect data on her computer relating to emails involving Kao from April 21 to June 27, 2008. USF responded that it had produced all relevant emails to or from Turpin during this period, and that USF "will not produce the requested computer[] for inspection." Kao also introduced USF's amended July 21, 2011 response to the discovery request, which stated that USF "has performed a diligent search for the computer used at the stated times by Jennifer Turpin, and the computer is no longer within the possession or control of the University. Therefore, it is not available for inspection."

Kao thereafter sought to put in evidence his July 14, 2011 motion to compel production of Turpin's computer. The court sustained USF's relevance objection to introduction of this document. Kao contends that the court erred in so doing because the document would have supported an inference of spoliation on USF's part. He reasons that Turpin's computer "was apparently in existence in May when the emails were allegedly printed out from it, but lost or destroyed only *after* he moved to compel its production in July. . . . The trial court, however, refused to admit the key document in this sequence of events: The motion to compel that preceded USF's claim that the computer was gone. Without that key document reflecting the sequence and timing, the facts of the changed discovery responses lacked significant impact as evidence of loss or destruction of evidence. The court, thereafter, refused to give the jury a spoliation instruction."

The trial court correctly concluded that the facts surrounding the request for production were irrelevant. When Kao asked for Turpin's computer, USF first said that it had produced all pertinent emails, and then said that the computer could not be produced even if Kao had some reasonable need for it. Kao's beliefs that USF lost or destroyed the computer to prevent him from inspecting it, and that the spoliation was prompted by his request for production in between USF's discovery responses, are entirely speculative.

Kao argues: "Evidence on the computer was reasonably likely to show that Dean Turpin had repeatedly revised her account of the April incident to make [him] look worse. Such evidence would have permitted the argument and inference that USF's

entire claim that Dr. Kao was engaging in frightening behavior was false or exaggerated as well.  This went to the heart of USF's claimed need for the psychological examination. The court's rulings were therefore highly prejudicial."  We disagree.  Turpin was not the only one who was frightened by Kao, and the minor changes she made to her initial description of the incident did not materially alter her account or suggest that she had anything to hide on her computer.

### III.  DISPOSITION

The judgment is affirmed.


_____

Siggins, J.


We concur:


_____

McGuiness, P.J.


_____

Jenkins, J.

Filed 9/2/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JOHN S. KAO,<br><br>    Plaintiff, Cross-defendant, and Appellant,<br><br>v.<br><br>THE UNIVERSITY OF SAN FRANCISCO et al.,<br><br>    Defendants, Cross-complainants, and Respondents. | A135750<br><br>(City and County of San Francisco Super. Ct. No. CGC-09-489576)<br><br>**ORDER CERTIFYING OPINION FOR PUBLICATION** |

**THE COURT:**

The opinion filed in the above-entitled matter on August 4, 2014, was not certified for publication in the Official Reports. For good cause, the request for publication by defendants and respondents is granted.

Pursuant to rule 8.1105(b) of the California Rules of Court, the opinion in the above-entitled matter is ordered certified for publication in the Official Reports.

DATE: _____                    _____

                                                                                Siggins, Acting P.J.

1

| | |
|---|---|
| Trial Court: | San Francisco County Superior Court |
| Trial Judge: | Honorable Wallace P. Douglass |
| Counsel for Appellant: | Christopher W. Katzenbach<br>Conor D. Mack<br>KATZENBACH LAW OFFICES |
| Counsel for Respondents: | Michael J. Vartain<br>Kathryn J. Burke<br>VARTAIN LAW GROUP |