Filed 8/25/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| GLORIA ELIZABETH ROSSI,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>SEQUOIA UNION ELEMENTARY SCHOOL et al.,<br><br>    Defendants and Respondents. | F085416<br><br>(Super. Ct. No. VCU292564)<br><br><br>**OPINION** |

APPEAL from an order of the Superior Court of Tulare County. Bret D. Hillman, Judge.

Howard Williams, Emilio Martinez and Dana Oviedo for Plaintiff and Appellant.

Weakley & Arendt, James D. Weakley and Matthew P. Bunting for Defendants and Respondents.

-ooOoo-

Plaintiff Gloria Elizabeth Rossi appeals the trial court's order sustaining the defendants' demurrer to her complaint, without leave to amend. Plaintiff was placed on unpaid administrative leave and then terminated from her employment with defendant Sequoia Union Elementary School District (the School District) after refusing to either provide verification of her COVID-19 vaccination status or undergo weekly testing as required by a then-operative order of the State Public Health Officer.

Plaintiff brought suit under the Confidentiality of Medical Information Act (CMIA) (Civ. Code, § 56 et seq.)[1] against defendants the School District; Sequoia Union Elementary School (the School) where she worked; and Ken Horn, the School principal and superintendent. The complaint asserts two causes of action under the CMIA, alleging (1) discrimination due to her refusal to authorize release of her medical information and (2) unauthorized use of her medical information. The trial court sustained defendants' demurrer without leave to amend, finding each claim failed as a matter of law due to certain statutory exceptions.

This appeal is related to two other contemporaneous appeals (*Dennis v. Tulare City School District* (Aug. 25, 2023, F085428) [nonpub. opn.]; *Moran v. Tulare County Office of Education* (Aug. 25, 2023, F085385) [nonpub. opn.]) from nearly identical orders by judges of the Tulare County Superior Court dismissing identical CMIA causes of action by similarly situated school-worker plaintiffs. The plaintiff-appellants in all three cases were represented by the same counsel; the cases were argued on the same day before the same panel of this court; and we now issue opinions affirming the trial court's orders on substantially identical grounds in all three cases.

**FACTS AND PROCEDURAL HISTORY**

From March 2020 through February 2023, California was in a State of Emergency due to COVID-19. (Governor's Proclamation (Feb. 28, 2023) [terminating state of

---

[1] All further statutory references are to the Civil Code unless otherwise stated.

2.

emergency declared Mar. 4, 2020] <https://mclist.us7.list-manage.com/track/ click?u=afffa58af0d1d42fee9a20e55&id=edc0e06ca6&e=0b26ba1b5> [as of Aug. 25, 2023];[2] see Gov. Code, § 8627.) Midway through this period, on August 11, 2021, the State Public Health Officer issued an order requiring K-12 schools to verify the COVID-19 vaccination status of all school workers (State Dept. of Public Health, State Public Health Officer Order of Aug. 11, 2021 <https://www.cdph.ca.gov/Programs/CID/DCDC/ Pages/COVID-19/Order-of-the-State-Public-Health-Officer-Vaccine-Verification-for-Workers-in-Schools.aspx> [as of Aug. 25, 2023]) (Order or Public Health Order).[3] Because this Order forms the basis of the trial court's dismissal order, we describe its contents in some detail.

As described in the prefatory text, the Public Health Order "require[d] verification of vaccination status among eligible K-12 school workers, and establishe[d] diagnostic screening testing of unvaccinated workers to minimize the risk that they will transmit while on K-12 school campuses, where a majority of students are not vaccinated and younger students are not yet eligible for vaccines." The Order provided that all covered schools "must verify [the] vaccine status of all workers" and listed specific modes of proof of vaccination. (Public Health Order, part II.A.) Further, "[a]symptomatic unvaccinated or incompletely vaccinated workers [were] required to undergo diagnostic screening testing" at least once per week, using either PCR (molecular) or antigen tests.

---

[2] On our own motion, we take judicial notice of the dates indicated in the Governor's February 28, 2023 Proclamation, a matter which is not of substantial consequence to the determination of the action. (See Evid. Code, §§ 452, subd. (h), 459, subds. (c), (d).)

[3] At defendants' request, and without objection by plaintiff, the trial court took judicial notice of the Public Health Order both as to its existence and as to the truth of its statements. On appeal, plaintiff argues it was improper for the trial court to take judicial notice of the statements contained in the Order because they are reasonably disputable. We disagree. The statements in the Order requiring certain actions by certain entities and individuals are not reasonably disputable, even if their impact on defendants' legal duties is. On our own motion, we likewise take judicial notice of the Order both as to its existence and as to the truth of the statements contained therein. (See Evid. Code, § 459, subd. (a).)

(*Id.*, part III.A., B., boldface omitted.)  Of particular importance to this appeal, the Order specified that "[w]orkers who are not fully vaccinated, or for whom vaccine status is unknown or documentation is not provided, must be considered unvaccinated." (*Id.*, part II.C.)  The Order also stated that schools whose workers were required to test "must report results to local public health departments." (*Id.*, part III.D.)  The Order defined school " 'worker[s]' " as all paid and unpaid adults serving in K-12 school settings both public and private, including on-site volunteers.  (*Id.*, parts I., IV.F.)

The Public Health Order, which took effect on August 12, 2021, provided that "[f]acilities must be in full compliance" by October 15, 2021.  (Public Health Order, *supra*, part VII.)  The Order remained in effect until its rescission, effective September 17, 2022, about two months after plaintiff's termination. (See State Dept. of Public Health, State Public Health Officer Order of Sept. 13, 2022 [rescinding Aug. 11, 2021 Public Health Officer Order effective Sept. 17, 2022] <https://www.cdph.ca.gov/ Programs/CID/DCDC/Pages/COVID-19/Order-of-the-State-Public-Health-Officer-Vaccine-Verification-for-Workers-in-Schools.aspx> [as of Aug. 25, 2023].)

When the Public Health Order went into effect, plaintiff was working at the School, as she had for decades, providing in-person classroom assistance for children with special needs and children whose primary language is Spanish.  The complaint describes the events leading to plaintiff's termination by reproducing a series of written communications (e-mails and letters) between plaintiff and defendant Horn, the School principal.  In summary, defendants began requiring proof of their workers' COVID-19 vaccination status in September and October 2021; but plaintiff consistently refused to disclose her vaccination status or undergo weekly testing, informing Horn that she did not consent to him obtaining or disclosing her medical information.  Horn repeatedly referenced the School's obligation to comply with the Public Health Order by having plaintiff either prove vaccination or test weekly.  In one of his initial e-mails to plaintiff, he wrote, "Allowing you to continue work on campus, without verifying your COVID-19

4.

vaccine status nor submitting to weekly testing, would require the [School] [D]istrict to violate [the] Order, which carries the force of law." In the same e-mail, Horn directed plaintiff to remain home in light of her refusals; and at a meeting the next day he offered her the option of working remotely as a "discretionary accommodation." Plaintiff declined, believing that she could not fulfill her job duties remotely.

Given plaintiff's rejection of the option to work remotely, Horn directed her to report to work in person and to at least comply with the weekly COVID-19 testing requirement or face disciplinary action. Plaintiff continued not to provide proof of vaccination or weekly test results, and on October 28, 2021, defendants informed plaintiff she was being placed on unpaid leave until she followed the test-or-vaccinate requirements. Specifically, Horn informed plaintiff: "As a result of your non-compliance, you are ineligible to work for [the School District]. Because you are no longer eligible to work for the [School] District, you have been placed in a nondisciplinary unpaid status." Plaintiff responded, "I do not consent to giving up any of my medical information," and she asked Horn to reinstate her authorization to return to work immediately or terminate her employment.

A few weeks later, still having not complied with the vaccinate-or-test requirements, plaintiff received another letter from Horn providing a "second warning." The second warning letter described the requirement to submit proof of COVID-19 testing as a "new job-related requirement." The letter stated the School District was "legally required to consider [plaintiff] not in compliance with [the Public Health] Order" due to her failure to verify her "vaccination or testing status." The letter also noted plaintiff's "repeated failure to adhere to the law in accordance with [School] District policies and directives is unprofessional and demonstrates insubordination." Plaintiff once again refused to "giv[e] up any of [her] medical information," requesting that she either be reauthorized for work or terminated. About one week later, in late November 2021, Principal Horn sent another letter confirming that plaintiff would "remain in unpaid

5.

status unless and until [she] either bec[a]me fully vaccinated against COVID-19 or submit[ted] to weekly COVID-19 testing."

The complaint does not describe any further communications between the two over the rest of the school year, but plaintiff alleges she received a formal "statement of dismissal," signed by Horn on July 7, 2022, terminating her employment. Plaintiff filed the instant complaint less than two weeks later.

The complaint asserts two causes of action under the CMIA: (1) discrimination due to plaintiff's refusal to authorize a release of her medical information, in violation of section 56.20, subdivision (b) (section 56.20(b));[4] and (2) unauthorized use of her medical information, in violation of section 56.20, subdivision (c) (section 56.20(c)).[5]

### Demurrer and Trial Court Ruling

Defendants demurred, arguing the section 56.20(b) discrimination cause of action failed because defendants "took such action as [was] necessary in the absence of medical information due to [p]laintiff's refusal to sign an authorization," invoking the Public Health Order and the second sentence of section 56.20(b). Defendants argued the

---

[4]     Section 56.20(b) reads in full:

"(b) No employee shall be discriminated against in terms or conditions of employment due to that employee's refusal to sign an authorization under this part. However, nothing in this section shall prohibit an employer from taking such action as is necessary in the absence of medical information due to an employee's refusal to sign an authorization under this part." (§ 56.20(b).)

[5]     Section 56.20(c) reads, in relevant part:

"(c) No employer shall use, disclose, or knowingly permit its employees or agents to use or disclose medical information which the employer possesses pertaining to its employees without the patient having first signed an authorization under [s]ection 56.11 or [s]ection 56.21 permitting such use or disclosure, except as follows:

"(1) The information may be disclosed if the disclosure is compelled by judicial or administrative process or by any other specific provision of law." (§ 56.20(c).)

section 56.20(c) unauthorized use cause of action failed because, first, they did not "use" plaintiff's medical information, plaintiff never having provided her vaccination or testing status, and even assuming they had, their use of that information "was compelled by … [a] specific provision of law" (§ 56.20, subd. (c)(1)), namely, the Public Health Order.

The trial court issued a tentative ruling sustaining the demurrer without leave to amend. No party requested oral argument, and the tentative ruling became the order of the court. At the outset of the ruling, the trial court granted defendants' unopposed request for judicial notice of the Public Health Order both as to its existence and as to its contents, observing, "The truth of the statements contained in the Order do not appear to be reasonably disputable." Regarding the sufficiency of the discrimination cause of action, the trial court found the complaint satisfactorily pleaded all elements of a section 56.20(b) claim, which it correctly noted were as follows, drawing from CACI No. 3071:

> "1. That Defendants asked Plaintiff to sign an authorization so that Defendants could obtain medical information about Plaintiff from their health care providers;
>
> "2. That Plaintiff refused to sign the authorization;
>
> "3. That Defendants terminated Plaintiff's employment;
>
> "4. That Plaintiff's refusal to sign the authorization was a substantial motivating reason for Defendants' decision to terminate employment;
>
> "5. That Plaintiff was harmed; and
>
> "6. That Defendants' conduct was a substantial factor in causing Plaintiff's harm."

As to the first two elements—request for an authorization and refusal to authorize—the trial court noted the absence of any literal request for plaintiff to "sign an authorization" allowing defendants to obtain her medical information from a health care provider. (§ 56.20(b).) However, the trial court found these elements satisfied based on

7.

two CMIA cases cited in the complaint (*Loder v. City of Glendale* (1997) 14 Cal.4th 846 (*Loder*); *Kao v. University of San Francisco* (2014) 229 Cal.App.4th 437 (*Kao*)), which the trial court viewed as treating the plaintiffs' refusals to take a test or release medical information as refusals to sign an authorization. The trial court found the remaining elements clearly satisfied or presumed satisfied on demurrer.

However, the trial court agreed with defendants that the necessity exception in section 56.20(b)'s second sentence shielded defendants from liability as a matter of law. The trial court viewed the Public Health Order as mandating that defendants require testing of all employees whose vaccination status was unknown. "Following the requirements of the Order and obtaining full compliance by October 15, 2021 were not optional steps" for defendants, the court observed. The court found that, in the absence of the vaccine status or weekly test results required by the Public Health Order, defendants' placement of plaintiff on unpaid leave was " 'necessary in the absence of the medical information.' " Unlike in *Loder*, *supra*, 14 Cal.4th 846 and *Kao*, *supra*, 229 Cal.App.4th 437, where the court acknowledged factual questions were essential to determining business necessity, the court held in this case the exception was rooted in the Public Health Order and therefore applied as a matter of law. Adopting the language of defendants' demurrer, the court explained, " 'If … [d]efendants had permitted [p]laintiff to continue working and not placed her on administrative leave, [they] would blatantly be violating the [Public Health] Order.' "

The trial court then turned to the unauthorized use cause of action under section 56.20(c). The court rejected defendants' argument that because plaintiff never provided her vaccination status, they could not have used such medical information. The court reasoned that plaintiff's refusal to provide her vaccination status resulted in a determination that plaintiff was unvaccinated, "which is, to a degree, 'medical information' [regarding] [p]laintiff['s] medical history or treatment as it was in *Loder* and *Kao*." However, the court agreed with defendants' alternative argument that

8.

subdivision (c)(1) of section 56.20 (section 56.20(c)(1)) contained a built-in defense for disclosure of medical information when "compelled by judicial or administrative process or by any other specific provision of law" (§ 56.20(c)(1)). For the same reasons discussed for the section 56.20(b) cause of action, the court found "as a matter of law, that [d]efendants were compelled to take the actions described in the complaint by the Order and therefore have an applicable defense to this cause of action."

In sum, the trial court found defendants "effectively had no choice but to implement the policies stated in the [Public Health] Order, including weekly testing of [p]laintiff." Discerning no set of facts that plaintiff could plead to overcome the effect of the Order, the court sustained the demurrer without leave to amend. This appeal followed.[6] At our request, the parties filed supplemental briefs addressing certain issues we deemed relevant.

## DISCUSSION

### I. Standard of Review

On appeal from a final order sustaining a demurrer, we review the record de novo—without deference to the trial court's ruling or its reasoning—to determine the legal question of whether the facts alleged state a claim for relief. (See *Bichai v. Dignity Health* (2021) 61 Cal.App.5th 869, 876; *Visalia Unified School Dist. v. Superior Court* (2019) 43 Cal.App.5th 563, 568 [describing de novo review].) We accept as true all of the pleading's material factual allegations, unless contrary to law or judicially noticed fact. (*City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 865; *SLPR, L.L.C. v.*

---

[6] A judgment of dismissal following defendants' successful demurrer does not appear in the record, and "[a]n order sustaining a demurrer is usually not immediately appealable, because it is not on its face a final judgment. [Citation.] However, it may be treated as a judgment for purposes of appeal when, like a formal judgment, it disposes of the action and precludes further proceedings." (*Thaler v. Household Finance Corp.* (2000) 80 Cal.App.4th 1093, 1098.) Because the demurrer was sustained as to all causes of action, without leave to amend, we deem the order sustaining the demurrer to constitute an appealable judgment of dismissal.

9.

*San Diego Unified Port Dist.* (2020) 49 Cal.App.5th 284, 317.) An order sustaining a demurrer must be affirmed if it is correct on any ground asserted in the demurrer, independent of the trial court's stated reasons. (*Bichai*, at p. 877; see *Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967.)

"In determining the sufficiency of a complaint against demurrer a court will consider matters that may be judicially noticed. (*Javor v. State Board of Equalization* (1974) 12 Cal.3d 790, 796; Code Civ. Proc., §§ 430.30, 430.70.) 'Accordingly, a complaint otherwise good on its face is subject to demurrer when facts judicially noticed render it defective.' " (*Joslin v. H.A.S. Ins. Brokerage* (1986) 184 Cal.App.3d 369, 374.) A demurrer may be sustained not only when the complaint fails to plead facts sufficient to state a cause of action, but also when the complaint includes " 'allegations that clearly disclose some defense or bar to recovery.' " (*Casterson v. Superior Court* (2002) 101 Cal.App.4th 177, 183, italics omitted; accord, *California Dept. of Tax & Fee Administration v. Superior Court* (2020) 48 Cal.App.5th 922, 929.)

## II. Analysis

Plaintiff primarily argues her claims should not have been dismissed on demurrer because it is a factual question for the jury whether defendants' disciplinary actions were "necessary," given that the Public Health Order did not dictate how to enforce its requirements and imposed no penalties for noncompliance. Relatedly, plaintiff argues the trial court erred by treating the Public Health Order as superseding the CMIA when the Order was not intended to do so. Plaintiff appears to assert these arguments as a basis to revive both causes of action, only addressing the distinct language of section 56.20(c)(1)'s exception in her supplemental briefing at our request.

Plaintiff also repeatedly argues that the trial court improperly sustained the demurrer because the necessity argument was not raised by defendants in their demurrer. There is no merit to this argument, as defendants' notice of motion and supporting points and authorities expressly argued that they "took such action as [was] necessary in the

10.

absence of medical information due to [p]laintiff's refusal to sign an authorization," with respect to section 56.20(b), and that section 56.20(c)(1)'s exception applied because the Public Health Order was a "specific provision of law" that "compelled" the challenged action. Indeed, plaintiff's opposition brief in the trial court acknowledged and responded to these very arguments. We therefore reject this unfounded procedural argument and turn to plaintiff's substantive contentions.

### A. Section 56.20 of the CMIA

The CMIA, as amended and reenacted in 1981,[7] "is intended to protect the confidentiality of individually identifiable medical information obtained from a patient by a health care provider, while at the same time setting forth limited circumstances in which the release of such information to specified entities or individuals is permissible." (*Loder*, *supra*, 14 Cal.4th at p. 859.)

The CMIA mostly governs disclosures of patient medical information by health care providers, but one chapter governs the use and disclosure of employee medical information by employers. (See Civ. Code, div. 1, pt. 2.6, ch. 3.) The substantive employer prohibitions—and their relevant exceptions—are found in the four subdivisions under section 56.20. The present complaint asserts violations of subdivisions (b) and (c) of section 56.20. Although plaintiff's briefs appear to subsume her arguments on the section 56.20(c) claim within her discussion of the section 56.20(b) claim, we find it more appropriate to address each claim separately.

---

[7] The original CMIA enacted in 1979 met with heavy criticism and was blocked from taking effect until its repeal and reenactment as amended in 1981. (See *Pettus v. Cole* (1996) 49 Cal.App.4th 402, 425.)

11.

1.  The Section 56.20(b) Discrimination Claim

Section 56.20(b) consists of two sentences—the first a prohibition on discrimination, and the second a "necessity" exception:

> "(b) No employee shall be discriminated against in terms or conditions of employment due to that employee's refusal to sign an authorization under this part. However, nothing in this section shall prohibit an employer from taking such action as is necessary in the absence of medical information due to an employee's refusal to sign an authorization under this part." (§ 56.20(b).)

The term "authorization" features heavily in the CMIA, and it is defined as a written document permitting a health care provider[8] or an employer to disclose one's medical information to others.[9] (See §§ 56.05, subd. (a), 56.11 [providers], 56.21 [employers].) Thus, as explained by our Supreme Court:

> "An employer 'discriminates' against an employee in violation of section 56.20, subdivision (b), if it improperly retaliates against or penalizes an employee for refusing to authorize the employee's *health care provider* to disclose confidential medical information *to the employer or others* (see Civ. Code, § 56.11), or for refusing to authorize *the employer* to disclose confidential medical information relating to the employee *to a third party* (see Civ. Code, § 56.21)." (*Loder*, *supra*, 14 Cal.4th at p. 861.)

i.      *The Limited Case Law on Section 56.20(b)*

The only two published cases substantively addressing a section 56.20(b) discrimination claim are our Supreme Court's decision in *Loder*, *supra*, 14 Cal.4th 846 and the First Appellate District's decision in *Kao*, *supra*, 229 Cal.App.4th 437.

---

[8]    The CMIA's proscriptions for health care providers also apply to health care service plans, pharmaceutical companies, and contractors, but for simplicity we refer only to health care providers in this decision.

[9]    To be valid, a provider authorization must be signed by the patient (except in circumstances not applicable here), identify the parties authorized to disclose and receive the medical information, specify an end date for the permissive disclosure, and advise that the signer has a right to receive a copy of the authorization. (§ 56.11.) "Medical information" is also specifically defined in the CMIA (§ 56.05, subd. (i)), but its definition is more relevant to our analysis, *post*, of the section 56.20(c) cause of action.

12.

*Loder* was a taxpayer's suit to enjoin the City of Glendale's policy requiring drug testing of all city job applicants and current city employees seeking promotion.  (*Loder*, *supra*, 14 Cal.4th at pp. 852, 856.)  Under the policy, job or promotion seekers were automatically disqualified from consideration if they refused to sign a form authorizing the physician conducting the drug testing to inform the city of the test results.  (*Id.* at p. 860.)  Despite sustaining certain constitutional challenges to the policy, the Supreme Court rejected the plaintiff's statutory claim that the policy violated section 56.20(b).  The court explained:

> "[A]n employer who disqualifies an employee or job applicant *for refusing to permit the employer to be informed of the ultimate results of an employer-mandated medical examination or drug test*, like an employer who disqualifies an employee or applicant who fails or refuses *to take the required examination or test*, has not 'discriminated' against the employee or applicant for refusing to sign an authorization of disclosure, but instead simply has taken 'such action as is necessary in the absence of medical information due to [the] employee's refusal …,' as specifically authorized by section 56.20, subdivision (b)."  (*Loder*, *supra*, 14 Cal.4th at p. 861.)

The court viewed the city's disqualification of those refusing to authorize disclosure as necessary because the testing policy "obviously would be totally ineffective if an employer could not treat an individual who refuses to permit the employer to learn the ultimate results of the examination in the same fashion as an individual who refuses to complete the test."  (*Loder*, *supra*, 14 Cal.4th at p. 861.)  Rejecting the plaintiff's argument that employers must justify the necessity of their actions under a " 'compelling interest' " standard (*ibid.*), the court concluded that, "so long as an employer-mandated medical examination or drug testing program is otherwise lawful, section 56.20, subdivision (b), does not prohibit an employer from disqualifying an applicant or employee who refuses to authorize disclosure to the employer of the ultimate results of the examination or test" (*id.* at p. 862).

Many of *Loder*'s statements of law regarding section 56.20(b) appear helpful to defendants' efforts to show that they were not discriminating against plaintiff for failure to authorize disclosure but rather acting as necessary in the absence of information about plaintiff's COVID-19 vaccination or testing status.[10]  However, until our request for supplemental briefing, defendants did not argue that any of the above language in *Loder* dictated the outcome of the section 56.20(b) claim; and their supplemental brief offers just one paragraph of argument that because the Public Health Order was legal, section 56.20(b) did not prohibit the School from disqualifying plaintiff from employment for refusing to share her vaccination status or weekly PCR/antigen test results.

As plaintiff argues in her supplemental brief, there are several distinguishing features of *Loder* that might minimize its impact on this case.  *Loder* was a taxpayer's facial challenge to a testing policy (*Loder*, *supra*, 14 Cal.4th at p. 856), whereas this is an employee's as-applied claim; *Loder* involved a policy testing for illegal drugs and alcohol (*id.* at p. 852), whereas this case involves testing for a virus; the policy in *Loder* required applicants to sign an actual authorization form thereby allowing the court to conclude the city was treating non-*authorizing* applicants the same as non-testing applicants (*id.* at pp. 860–861), whereas here there is no allegation that plaintiff was asked to sign an authorization for disclosure (see fn. 11, *post*); and the section 56.20(b) claim in *Loder* was rejected after a full evidentiary hearing (*Loder*, at pp. 857–858), whereas the claim was dismissed on demurrer here.  We are not confident all of these distinctions truly make a difference, but we also are not persuaded that *Loder* necessarily precludes plaintiff's section 56.20(b) claim.

---

**10**     For instance, in addition to the above quoted passages, *Loder* also states that section 56.20(b) "cannot reasonably be interpreted to regulate the circumstances under which an employer may require job applicants or current employees to submit to a medical examination or drug test."  (*Loder*, *supra*, 14 Cal.4th at p. 862.)

14.

Based on the arguments presented, we are not prepared to treat *Loder* as establishing a standard that an employer-mandated medical exam/testing policy is only subject to section 56.20(b)'s discrimination prohibition if the program is shown not to be "otherwise lawful." (*Loder, supra*, 14 Cal.4th at p. 862.) We also decline to rest our decision on the other potentially significant passages from *Loder* in the absence of substantial briefing of their impact.

Turning to the second of the published section 56.20(b) cases, the First Appellate District's decision in *Kao, supra*, 229 Cal.App.4th 437 comes closer to the facts of our case but contains fewer pronouncements of CMIA law. *Kao* offers an example of the necessity exception being successfully invoked to defeat an individual employee's section 56.20(b) claim challenging his termination as discriminatory. In *Kao*, a university directed the plaintiff professor to undergo a fitness-for-duty examination after colleagues reported that his behavior was frightening them, and the university terminated his employment when he refused to participate in the examination. (*Kao*, at pp. 439–440.) The Court of Appeal upheld the jury's adverse verdict on each of the professor's statutory claims, including those under the CMIA and the Fair Employment and Housing Act (Gov. Code, § 12900 et seq.). Citing the professor's multiple instances of threatening behavior, the court concluded the jury had ample evidence to find the medical examination " 'job related and consistent with business necessity' " as required to defeat his Fair Employment and Housing Act claim and therefore also " 'necessary' " within the meaning of section 56.20(b). (*Kao*, at pp. 451, 453.)

ii. *Application*

Before reviewing the necessity exception's application to the present case, we pause momentarily to express some doubt as to whether plaintiff adequately pleaded the first two elements of a prima facie section 56.20(b) claim: that defendants asked her to sign an "authorization" (§§ 56.05, subd. (a), 56.11) and she refused to do so. (See CACI No. 3071.) The trial court assessed *Loder, supra*, 14 Cal.4th 846 and *Kao, supra*,

15.

229 Cal.App.4th 437 as indicating "that a refusal to take a test or release medical information are akin to refusing to sign an authorization." Although defendants do not challenge this assessment, we do not read *Loder* and *Kao* that way.[11] Still, we are willing to overlook any deficiency in the prima facie section 56.20(b) allegations because we agree with the trial court that the necessity exception applies here in any event.

---

[11] *Loder* does not say that a refusal to take a medical test is the same as a refusal to authorize disclosure of medical information *for purposes of satisfying the first two elements* of a section 56.20(b) claim. Rather, in addressing the third element, "discrimination," and the necessity exception, the *Loder* court identified two groups of job/promotion applicants: (A) those who refuse to take the test; and (B) those who take the test and refuse to authorize disclosure of their results. (*Loder*, *supra*, 14 Cal.4th at p. 861.) Our Supreme Court then held that *there was no impermissible discrimination* because the employer was treating these two groups the same—by disqualifying both groups in favor of the third group, (C) those who take the test and authorize disclosure. (*Ibid.*) The court reasoned that treating groups A and B the same was necessary to avoid rendering the whole testing policy ineffective, and therefore fell within section 56.20(b)'s necessity exception. (*Loder*, at p. 861.)

However, the policy at issue in *Loder* did in fact require job/promotion applicants to sign a literal authorization form presented to them before the physician conducted the drug tests. (*Loder*, *supra*, 14 Cal.4th at p. 860.) Therefore, we are reluctant to view *Loder* as endorsing the sufficiency of a prima facie section 56.20(b) claim that does not involve a request for the employee to authorize the employer to obtain medical information about the employee from the employee's health care provider.

*Kao* provides slightly more support for accepting a refusal to take a test as a refusal to sign an authorization to make out a section 56.20(b) claim. The plaintiff's claim in *Kao* indeed went to a jury and was adjudicated on its merits, despite him simply refusing to undergo the fitness-for-duty examination. Professor Kao was, however, presented with a "consent form" related to the requested examination even though that fact does not feature heavily in the decision (*Kao*, *supra*, 229 Cal.App.4th at p. 444); and in any event, the Court of Appeal was not deciding an issue related to the prima facie elements of the claim, but rather the sufficiency of the evidence to support the necessity exception (*id.* at p. 453).

We do not wish to imply that a literal authorization form is always required to state a section 56.20(b) claim; what is important is that there be allegations that the employer was actually seeking the plaintiff's permission to obtain her medical information from a healthcare provider. (See §§ 56.05, subd. (a), 56.11.) Here, plaintiff alleges that she was instructed to *personally* provide proof of vaccination to her employer; and although that document would include medical information derived from a health care provider, there is no allegation that the School defendants ever requested that plaintiff authorize *her health care provider* to disclose that information to defendants. The gap is even larger when it comes to plaintiff's refusal to undergo weekly PCR or antigen testing, since there are no allegations that a health care provider would necessarily be involved in such testing.

16.

Plaintiff argues *Loder* and *Kao* show that the question of whether an employer's action was "necessary" is an inherently factual question which must be left for the fact finder to answer—and therefore cannot be resolved on a demurrer. We disagree. Although the necessity exception might generally require factual determinations, it does not always require them. Where, as here, an employer demonstrates that it acted out of a legal necessity to comply with a lawful order—as opposed to acting based on a general business necessity—the exception's application can be determined as a matter of law. Plaintiff is correct that, in general, "reasonable minds can differ about what constitutes necessity." In the typical case, as exemplified in *Kao*, *supra*, 229 Cal.App.4th 437, the fact finder will be the one to decide whether the employer provided enough evidence to show its actions were "necessary in the absence of medical information" or were simply discriminatory (§ 56.20(b)).

But neither *Kao* nor *Loder* addresses the scenario presented in this case, where the employer was acting not out of a general sense of duty or business efficiency but so as to comply with a lawful order of the State Public Health Officer. Notwithstanding plaintiff's passing disparagement of regulations issued by "an unelected executive branch bureaucrat/agency," it is undisputed the Public Health Order carried the full force of law while it was in effect, owing to the active state of emergency during its lifespan. (See Gov. Code §§ 8567(a), 8627; Governor's Proclamation of Feb. 28, 2023, *supra* [noting dates of state of emergency].) Contrary to plaintiff's assertion, the lack of any express enforcement provisions within the Order, such as imposing penalties for noncompliance, does not change the Order's legal effect. Plaintiff cites a completely separate doctrine requiring " 'certain and severe … penalties' " to establish a de facto reimbursable state mandate under article XIII B, section 6 of the California Constitution. (See *Department of Finance v. Commission on State Mandates* (2003) 30 Cal.4th 727, 754.) The present case has nothing to do with reimbursable state mandates, and in any event our case involves an actual (de jure) order mandating certain action by schools like the one where

plaintiff worked.  No penalty provisions were needed to make the Order fully binding on its covered entities and individuals.

Plaintiff's principal contention on appeal, however, is that the Public Health Order did not specify "what to do with individual employees not complying" and did not mandate their termination; she argues defendants' disciplinary actions were therefore undertaken at their discretion, not necessitated by the Order.  This argument requires interpreting the Order's provisions, a quintessential legal inquiry properly conducted by the court—not a factual one for the jury.  In this rather unique case, the question is whether defendants took "such action as [was] necessary [*to comply with the Public Health Order*] in the absence of medical information."  (§ 56.20(b).)  This is a purely legal question, one which we answer in the affirmative, like the trial court.

The Public Health Order required "full compliance" by facilities and mandated that all K-12 schools "*must* verify vaccine status of all workers" and that those schools with workers who must test (i.e., with workers not reporting complete vaccination) "*must* report results to local public health departments."  (Italics added.)  Notably, the School could not fulfill either of these requirements without the cooperation of plaintiff (and all School workers).  The administration could not verify her vaccination status on its own, and it could not transmit test results it did not have.  Although the Order did not literally state that unvaccinated and non-testing workers could not be present on school campuses, the Order's prefatory text makes clear that its goal was to "minimize the risk that [workers] will transmit [COVID-19] *while on K-12 school campuses*," to prevent endangering their students—the majority of whom were not yet vaccinated and the youngest of whom were not yet vaccine eligible.  (Italics added.)  Faced with plaintiff's refusal to allow defendants to comply with either their verification or test-reporting obligations, defendants had no choice but to impose disciplinary consequences precluding plaintiff from working in person until she at least started reporting test results weekly.  Plaintiff argues a fact finder might reasonably conclude that other reasonable

accommodations could have been reached besides putting her on unpaid leave and ultimately firing her—positing "plexiglass [or] physical distancing" as other possible solutions. However, we do not see how other potential arrangements like these would allow defendants to bring the School into "full compliance" with the Public Health Order. Even if defendants allowed plaintiff to return to work in the classroom from behind a plexiglass shield, that would not allow them to either verify her vaccination status or report all unvaccinated-worker test results to local health departments. There is no room for factual debate about how else defendants could have complied with the Order's requirements without directing plaintiff to stay home until she provided test results—and terminating her when it was clear she was never going to test.

In reaching this conclusion, we reject plaintiff's corollary argument that this interpretation of the Public Health Order allows it to "supersede" the CMIA without any indication the Order was meant to do so. As the trial court noted, section 56.20(b) expressly provides a necessity exception. Thus, the Order—giving rise to the necessity in this case—operates within the framework contemplated by the CMIA, not over and above it.

The trial court properly sustained the demurrer as to plaintiff's section 56.20(b) discrimination claim.

### 2. The Section 56.20(c) Unauthorized Use Claim

We likewise conclude that the demurrer was properly sustained for the second cause of action, under section 56.20(c), but not for the reasons stated by the trial court.

Section 56.20(c) provides that "[n]o employer shall use, disclose, or knowingly permit its employees or agents to use or disclose medical information which the employer possesses pertaining to its employees," unless the employee signs an authorization permitting such disclosure, or one of several statutory exceptions applies. The first of the statutory exceptions, and the only one asserted in this case, is found in section 56.20(c)(1), which states: "The information may be disclosed if the disclosure is

19.

compelled by judicial or administrative process or by any other specific provision of law."

Interpreting these provisions on a nearly blank judicial slate,[12] we understand section 56.20(c) and its compelled disclosure exception to apply differently in this case than did the trial court. The trial court was incorrect in finding section 56.20(c)(1)'s exception applied to defendants' actions; however, dismissal of plaintiff's section 56.20(c) cause of action was still proper because plaintiff failed to state a prima facie claim for defendants' unauthorized use of her medical information.

          i.        *Section 56.20(c)(1)'s Compelled Disclosure Exception Does Not Cover Defendants' Actions*

As the basis for dismissing the section 56.20(c) claim, the trial court adopted one of defendants' two arguments put forth in their demurrer: that the section 56.20(c)(1) compelled disclosure exception applied. The trial court found that, for the same reasons discussed for section 56.20(b), "[d]efendants were compelled to take the actions described in the complaint by the Order." The trouble with this reasoning is that "the actions described in the complaint" with respect to section 56.20(c) do not involve any "disclosure" of plaintiff's medical information by defendants, and section 56.20(c)(1)'s exception applies only to disclosures—not uses.

Section 56.20(c)'s prohibitory clause forbids both unauthorized "use[s]" and "disclos[ures]" of employee medical information by an employer. However, the four exceptions laid out in the paragraphs that follow this prohibition do not all uniformly apply to both uses and disclosures. As just mentioned, paragraph 1 allows information to be "*disclosed* if the *disclosure* is compelled by judicial or administrative process or by

---

[12]    We have found only one published case by a California court that substantively discusses section 56.20(c), and that case did not involve the compelled disclosure exception. (See *Pettus v. Cole*, *supra*, 49 Cal.App.4th at p. 451 [addressing exceptions under § 56.20, subd. (c)(2), (3)].) *Loder*, *supra*, 14 Cal.4th 846 and *Kao*, *supra*, 229 Cal.App.4th 437 solely address discrimination claims under section 56.20(b), not unauthorized use claims under section 56.20(c).

any other specific provision of law." (§ 56.20(c)(1), italics added.) Paragraph 2 permits relevant parts of medical information to be "*used or disclosed*" in connection with legal disputes between the employer and employee where the employee's medical history, condition, or treatment is in issue. (§ 56.20, subd. (c)(2), italics added.) Paragraph 3 permits medical information to be "used" for specific purposes like administering employee benefit plans and determining eligibility for medical leave. (§ 56.20, subd. (c)(3).) And paragraph 4 permits medical information to be "disclosed" to health care providers to aid in patient diagnosis or treatment where the patient is unable to authorize the disclosure. (§ 56.20, subd. (c)(4).) Given the Legislature's differential use of the verbs "disclosed" and "used" in each of the four exception paragraphs, we cannot conclude that it intended the exception in paragraph 1 to permit *both* "disclosure" *and* "use" whenever compelled by judicial process or other provisions of law.

The legislative history of section 56.20 confirms that section 56.20(c)(1) permits only *disclosures* compelled by law, not *uses* compelled by law. The CMIA bill (Sen. Bill No. 889) (1981–1982 Reg. Sess.) underwent various pre-enactment amendments, some in the Assembly and some in the Senate, before being chaptered in September 1981. (Stats. 1981, ch. 782, § 1, p. 3040.) The bill was introduced in the Senate and went to the Assembly in June of 1981, where it headed first to the Assembly Committee on Health. (Sen. Bill No. 889, approved by Governor, Sept. 25, 1981, Sen. Final Hist. (1981–1982 Reg. Sess.) p. 561.) When it arrived at the Assembly, the section of the bill that would become section 56.20(c)(1) read as follows:

> "(1) The information may be disclosed when the employer reasonably believes that disclosure is compelled by judicial or administrative process or by any other specific provision of law." (Sen. Amend. to Sen. Bill No. 889 (1981–1982 Reg. Sess.) May 14, 1981.)

On August 24, 1981, the Assembly Committee on Health amended that provision of Senate Bill No. 889 by removing the "reasonable belief" reference and adding a "use" component of the exception. The deletions and additions are reflected here:

21.

"(1)  The information may be disclosed ~~when the employer reasonably believes that~~ *if the* disclosure is compelled by judicial or administrative process or by any other specific provision of law*, and may be used to comply with other requirements mandated by law*."  (Assem. Amend. to Sen. Bill No. 889 (1981–1982 Reg. Sess.) August 24, 1981.)

Three days later, however, the Assembly Committee on Health again amended this provision and largely returned it to its original text (while still omitting the "reasonable belief" qualifier) as follows:

"(1) The information may be disclosed if the disclosure is compelled by judicial or administrative process or by any ~~other specific provision of law, and may be used to comply with other requirements mandated by law.~~ *other specific provision of law.*"  (Assem. Amend. to Sen. Bill No. 889 (1981–1982 Reg. Sess.) August 27, 1981.)

There were no further amendments to this provision of Senate Bill No. 889.

This chronology shows the Legislature actively considered and then rejected adding an exception to permit employers to use employee medical information "to comply with other requirements mandated by law."  We will not rewrite this statute by interpreting it in a way that would override the express legislative intent to limit the scope of section 56.20(c)(1)'s exception to permit employer *disclosures* of employee medical information when compelled by law.

The complaint pleads a section 56.20(c) cause of action arising purely from defendants' unauthorized *use* of plaintiff's purported medical information (that is, her presumed unvaccinated status) to terminate her employment.  There is no allegation that defendants *disclosed* her vaccination status to any third party.[13]  Again, section 56.20(c)(1)'s exception states:  "The information may be *disclosed* if the *disclosure* is compelled by judicial or administrative process or by any other specific provision of law."  (Italics added.)  In their supplemental brief, defendants do not argue

---

[13]    Indeed, plaintiff's opposition brief in the trial court confirmed that "the 'disclosure' of [her] information is not, at this time, being alleged," and instead "the [section] 56.20(c) cause of action is based on the *use*, rather than the disclosure, of [her] medical information."

22.

how their actions could constitute a disclosure, nor do they argue for a broader reading of section 56.20(c)(1). We conclude that defendants' challenged conduct does not fall within section 56.20(c)(1)'s compelled disclosure exception, and the trial court erred by concluding otherwise.[14]

### ii. Affirmance Is Warranted on an Alternative Ground

Nevertheless, defendants' other ground for dismissal asserted in their demurrer—their primary argument, which the trial court rejected—still provides a basis to affirm. (See *Bichai v. Dignity Health*, *supra*, 61 Cal.App.5th at p. 877 [Courts of Appeal must affirm if dismissal is correct on any ground stated in the demurrer, independent of the trial court's reasoning].) In our view, the complaint fails to adequately plead the prima facie elements of a section 56.20(c) cause of action because there are no allegations from which we can infer that defendants used "medical information which [they] possesse[d] pertaining to [plaintiff]." (§ 56.20(c).)

Defendants argued in their notice of motion and in their points and authorities supporting their demurrer that because plaintiff never provided her vaccination status, they could not have used that medical information when they never possessed it. The trial court, somewhat equivocally, rejected this argument, reasoning that plaintiff's refusal to provide her vaccination status resulted in a determination that plaintiff was unvaccinated, "which is, to a degree, 'medical information' [regarding] [her] medical history or treatment as it was in *Loder* and *Kao*." Defendants did not renew this

---

**14** Defendants do not identify any other applicable exception under section 56.20(c), nor do we see how any of its other three subparagraphs would apply. We note, however, that the language of section 56.20(b)'s necessity exception indicates that it applies across all subdivisions within section 56.20. (See § 56.20(b) ["nothing *in this section* shall prohibit an employer from taking such action as is necessary in the absence of medical information due to an employee's refusal to sign an authorization under this part" (italics added)].) There was no discussion either in the trial court or in the appellate briefs of the potential application of section 56.20(b)'s necessity exception to preclude liability under section 56.20, *subdivision (c)*, and because we are able to affirm on a fully briefed ground instead, we do so.

23.

argument on appeal until we ordered supplemental briefing on it. After considering the parties' supplemental arguments, we conclude defendants were correct from the start: The complaint does not allege their use of plaintiff's "medical information" as that term is defined in the statute.

"Medical information" is defined in the CMIA as "any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care … regarding a patient's medical history …, mental or physical condition, or treatment." (§ 56.05, subd. (i).) If plaintiff had alleged that she gave the employer defendants proof of her COVID-19 vaccination from a health care provider and that defendants used that information to her detriment (without her authorization), she would state a section 56.20(c) cause of action. To use a scenario closer to the actual allegations, if plaintiff had alleged that she gave defendants electronic or physical information from a health care provider confirming her *lack* of such vaccination and that defendants used that information to her detriment, she would also state a section 56.20(c) cause of action. However, what the complaint actually alleges is that, due to plaintiff's failure to inform defendants of her vaccination status one way or the other, defendants *presumed* that plaintiff was "unvaccinated," as they were required to do by the Public Health Order. (See Public Health Order, *supra*, part II.C. ["Workers who are not fully vaccinated, *or for whom vaccine status is unknown or documentation is not provided*, must be considered unvaccinated." (Italics added.)].)

Plaintiff directs us to no allegation that defendants "possesse[d]" (§ 56.20(c)) "individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care … regarding [her vaccination status]" (§ 56.05, subd. (i)). Her administrative classification as "unvaccinated" was not based on any information defendants received about plaintiff from any medical source. It was simply the default administrative classification required under the Public Health Order. We

cannot agree with the trial court that this automatic classification was, to any degree, "medical information" as defined under the CMIA.

In her supplemental brief, plaintiff argues it was not defendants' act of classifying her as unvaccinated that constituted a violation of section 56.20(c), but rather their act of firing her based on her refusal to comply with a coercive scheme that served as an " 'end run' " around the statute. That is, according to plaintiff, defendants were able to skirt the CMIA and obtain the information they "wanted to use" by asking a binary medical question and then treating a failure to answer as a negative answer. We are not persuaded. First, verification of plaintiff's vaccination status was something the Public Health Order required defendants to obtain, not something they simply "wanted to use." And, in any event, plaintiff's argument on this score is better directed to the Legislature, which defined "medical information" very specifically for purposes of the CMIA as (in relevant part): "any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care … regarding a patient's medical history." (§ 56.05, subd. (i).) That definition simply does not encompass an employer's *presumption* regarding an employee's medical status, especially not a presumption the employer was required to make by a lawful government order.

Without any factual allegations that defendants received any "medical information," such as medical records, a medical certification, or other information in "electronic or physical form … derived from a provider of health care" (§ 56.05, subd. (i)), the complaint fails to state a cause of action for unauthorized use of such information under section 56.20(c). (See *Erhart v. Bofi Holding, Inc.* (S.D.Cal. 2017) 269 F.Supp.3d 1059, 1077–1078.) Despite our invitation, plaintiff offers no argument on appeal as to how she could amend the complaint to show use of her "medical information." (See *Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919, 924 [leave to amend is warranted when "on the pleaded and noticeable facts there is a reasonable possibility of an amendment that would cure the complaint's legal defect or

25.

defects"].)  Indeed, the complaint asserts that plaintiff repeatedly expressly refused to provide any medical information to defendants.

Accordingly, dismissal of plaintiff's section 56.20(c) unauthorized use claim, without leave to amend, was also warranted.

## DISPOSITION

The order of the trial court is affirmed.  Defendants are awarded their costs on appeal.


                                                                        HILL, P. J.

WE CONCUR:


LEVY, J.


FRANSON, J.